Martin HARRIS, Albert Anthony, Orlando X. McCrea, Tyrone Glenn, Carlos Royster, Amin Abdullah, Khalid Allah Muhammad, and Arnold Furtick, Charles Oakes, Emanuel Gardner

v.

Irene PERNSLEY, individually and in her official capacity as Commissioner of the Department of Human Services of the City of Philadelphia, et al.

Civ. A. No. 82–1847.

United States District Court, E.D. Pennsylvania.

Feb. 19, 1987.

David Richman and Philip H. Lebowitz, Pepper, Hamilton & Scheetz, Philadelphia, for plaintiffs.

Richard J. Gold, Chief Deputy City Sol. and Guy J. Villim, Asst. City Sol., Law Dept., Philadelphia, Pa., for City defendants.

Carl Vaccaro, Deputy General Counsel, Harrisburg, Pa., for defendants Marks and Jeffes.

Rosalyn Robinson, Deputy General Counsel, Harrisburg, Pa., for defendant Waldman.

Sarah Vandenbraak and Gaele Barthold, Asst. Dist. Attys., Philadelphia, Pa., for Dist. Atty. of Philadelphia, Ronald Castille.

## MEMORANDUM

SHAPIRO, District Judge.

### I. *Facts and Procedural History*

Plaintiffs assert this civil rights action on behalf of themselves and all persons similarly situated in regard to conditions of confinement in prisons in the City of Philadelphia. Plaintiffs allege that Commonwealth and City officials responsible for the conditions of confinement in City prisons are violating the Eighth Amendment to the Constitution of the United States. A hearing on plaintiffs' motion to approve a settlement agreement between plaintiffs and the City defendants,[1] presented preliminarily to the court on October 10, 1986, was held on December 11, 1986. Upon full consideration of written submissions, including objections of the District Attorney of Philadelphia County, and a hearing on the settlement, the court approved the settlement between the plaintiffs and the City defendants as fair, reasonable and adequate to the class in an order dated December 30, 1986 (Order as amended January 6, 1987). This memorandum states the court's reasons for doing so.

This action was commenced by the filing of a *pro se* complaint and request to proceed *in forma pauperis* by ten Holmesburg Prison inmates on behalf of themselves and all other persons similarly situated. Plaintiffs' action, pursuant to 42 U.S.C.A. § 1983 (West 1981), alleged that the conditions of confinement in Holmesburg Prison violated the Eighth Amendment's prohibition against cruel and unusual punishment. Plaintiffs sued the Commissioner of the Department of Human Services of the City of Philadelphia, the members of the Board of Trustees of the Philadelphia Prison System, the Superintendent of the Philadelphia Prisons, the Warden of Holmesburg Prison, and the Medical Director of the Philadelphia Prisons, in their individual and official capacities. Leave to proceed *in forma pauperis* was granted and counsel appointed. Plaintiffs then filed an amended complaint deleting as a defendant the Medical Director of the Philadelphia Prisons but adding as defendants the City of Philadelphia, the Managing Director of the City of Philadelphia, the Mayor of the City of Philadelphia, the Commissioner of the Pennsylvania Bureau

---

1. The term City defendants is used to refer to all defendants represented by the City Solicitor's Office. Those defendants are: Irene Pernsley, individually and in her official capacity as Commissioner of the Department of Human Services of the City of Philadelphia, Royal L. Sims, Rev. Albert Campbell, Labora Bennett, James Barber, Mark Mendel, Donald Padova, each individually and in his or her official capacity as a member of the Board of Trustees of the Philadelphia Prison System, David S. Owens, individually and in his official capacity as Superintendent of the Philadelphia Prison System, Gueton Curione, individually and in his official capacity as Warden of Holmesburg Prison, Philip Dukes, individually and in his official capacity as Warden of the Detention Center, John Daughen, individually and in his official capacity as Warden of the House of Corrections, Rodney D. Johnson, individually, Leo C. Brooks, individually, James S. White, individually and in his official capacity as Managing Director of the City of Philadelphia, William J. Green individually, Hon. Wilson Goode, individually and in his official capacity as Mayor of the City of Philadelphia, and the City of Philadelphia.

of Corrections, and General Counsel of the Commonwealth of Pennsylvania, in their individual and official capacities. Defendants' motions to dismiss were granted on December 30, 1983 on two grounds, both of which were related to litigation pending in the state courts: res judicata and abstention. The claims against the Commonwealth defendants for money damages were dismissed on the grounds of official immunity.

In February, 1971, five inmates of the Philadelphia prison system had instituted *Jackson v. Hendrick*, a class action in equity in the Court of Common Pleas of Philadelphia County, Pennsylvania, to attack the constitutionality of their conditions of confinement and request injunctive relief against prison and city officials and the City of Philadelphia. On April 7, 1972, a three-judge court held that conditions in the Philadelphia County prisons violated the rights of inmates under, *inter alia*, the United States and Pennsylvania Constitutions; the *decree nisi* appointed a Prison Master to administer the court's corrective decree. On June 7, 1972, the decree became final; it was later affirmed by the Pennsylvania Supreme Court. *Jackson v. Hendrick*, 457 Pa. 405, 321 A.2d 603 (1974). The three-judge state court retained jurisdiction and continued to issue remedial orders and approve consent decrees entered into by the parties.[2] One order established a maximum inmate capacity for the Philadelphia prison system based on "one man-one cell." Nonetheless, plaintiffs here contended that unconstitutional conditions persisted.

The United States Court of Appeals, reversing the judgment of this court (Opinion by Gibbons, J.; Garth, J., dissenting), held that the Court of Common Pleas' judgment was not res judicata of the claims made in this action. The court explained:

> There is no identity of causes of action between the plaintiffs in the 1971 lawsuit and this one. No member of the present class even had a cause of action either for injunctive relief or for damages growing out of the conditions in Holmesburg in 1971, for no such class member was subjected to those conditions. A Pennsylvania judgment is not conclusive on matters which by reason of the nature of the case could not have been adjudicated.

*Harris v. Pernsley*, 755 F.2d 338, 342 (3d Cir.1984) (citations omitted).

The Court of Appeals also held that this was not a proper case for abstention under *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), because the plaintiffs sought money damages in federal court which the plaintiffs in the state court action did not. *Harris*, 755 F.2d at 346. The court stated,

> The mere pendency of a state court injunction predicated on federal law, which according to the complaint has not produced an alleviation of ongoing violations of the Constitution, is not such an exceptional circumstance as to relieve the federal courts of 'the virtually unflagging obligation ... to exercise the jurisdiction given them.'

755 F.2d at 345 (quoting *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246). Although the Commonwealth defendants were entitled to qualified official immunity on claims for money damages, they had

---

**2.** On January 16, 1987, the Pennsylvania Supreme Court assumed extraordinary jurisdiction and vacated a contempt order against the defendants for failing to comply with population limits fixed by the three-judge court. In light of *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), and the repeal of all Pennsylvania statutes requiring single-celling, see Act of July 10, 1981, P.L. 218 No. 68 § 1, 61 Pa.S.A. 2191 (Purdon's Supp.1986), the Pennsylvania Supreme Court held that the legal basis for a "one man, one cell" population limit had been eroded and that a current consideration of the "totality of the circumstances was required to determine whether conditions of confinement in the Philadelphia prisons are unconstitutional." *Jackson v. Hendrick*, 509 Pa. 456, 470, 503 A.2d 400, 407–08 (1986). The case is now on remand before the Court of Common Pleas, Trial Division. The three-judge panel submitted a report of the progress of the proceedings to the Pennsylvania Supreme Court on June 26, 1986.

filed no summary judgment motions. Dismissing the damages claims against them was held an error of law.

Petitions for rehearing were denied on March 21, 1985. *Harris v. Pernsley,* 758 F.2d 83 (3d Cir.1985) (Judges Adams, Hunter, Weis, Garth, and Becker would have granted the petition for rehearing). *Id.* Defendants petitioned the United States Supreme Court for a writ of certiorari; the petition was denied on November 4, 1985. — U.S. ——, 106 S.Ct. 331, 88 L.Ed.2d 314 (1985) (Justices Rehnquist and O'Connor would have granted certiorari; Chief Justice Burger dissented from the denial of the writ). *Id.*

Following remand, the trial court granted leave to file a second amended complaint in order to provide adequate class representation. Plaintiffs filed a second amended complaint on behalf of an expanded class of past, present and future inmates of all Philadelphia prisons and added the wardens of the Detention Center and the House of Corrections in their individual and official capacities as party defendants. The plaintiffs and City defendants also began settlement negotiations. This court was informed on August 8, 1986, that proposed related settlements had been reached in both the state and federal actions. A preliminary hearing on approval of the federal settlement was tentatively scheduled.

On August 19, 1986, District Attorney Ronald D. Castille moved to intervene as a party defendant pursuant to Fed.R.Civ.P. 24 in order to oppose the settlement. Mr. Castille sought intervention as of right pursuant to Fed.R.Civ.P. 24(a) or, in the alternative, permissive intervention pursuant to Fed.R.Civ.P. 24(b). A revised proposed consent order, of which the District Attorney was notified, was preliminarily presented to the court on October 10, 1986 and thereafter incorporated in a settlement agreement of November 14, 1986, amended by Stipulation of December 23, 1986, filed with the court. Briefing on the District Attorney's motion to intervene in opposition to settlement, an evidentiary hearing and oral argument followed; after a joint memorandum in support of the revised settlement was filed, a hearing on the proposed revised settlement and consent order was scheduled and publicized in the news media. In addition to publication of the notice of the hearing in *The Legal Intelligencer,* articles appeared in the *Philadelphia Inquirer* and the *Philadelphia Daily News* and the proposed settlement, District Attorney's opposition, and the court proceedings were reported by numerous radio and television broadcasts on several occasions.

The court stated on December 11, 1986 that the motion of District Attorney Castille to intervene as a party defendant would be denied, but the court also expressly agreed to hear the objections of the District Attorney to the settlement agreement regardless of that denial. The Order denying that motion and the Memorandum in support of the denial were filed on December 31, 1986.

The court having considered the oral submissions on December 11, 1986, the record made by the parties and the proposed intervenor, the information submitted on request of the court, and the court's personal tour of the prisons, determined upon an independent evaluation of the proposed settlement that it was fair, reasonable and adequate. Therefore, the court approved the settlement and entered a consent order on December 30, 1986.

The settlement is conditioned upon plaintiffs' filing a revised second amended complaint and certification, pursuant to Fed.R.Civ.P. 23(b)(2), of a plaintiff class of all individuals who are, or who have been, inmates of the Philadelphia prison system since April 30, 1980 and all future inmates of the Philadelphia prison system during the time the court retains jurisdiction over the case. Under the settlement agreement, the City defendants agree *inter alia* "to adopt and implement a series of procedures and policies to reduce the population of the Philadelphia prison system and maintain the population at agreed-upon levels." (Settlement Agreement, ¶ 3, p. 4).

First, the City defendants agree that all defendants in criminal proceedings shall be held at the Police Administration Building for at least four (4) hours from the time of preliminary arraignment to enable them to post bail. Those defendants with bail of $1,500 or less shall be held at the Police Administration Building for at least six (6) hours from the time of preliminary arraignment to enable them to post bail.

The City defendants agree that at no time shall more than two inmates be housed in a cell in the Philadelphia prison system. The agreement requires that every inmate shall be assigned to a housing area within seventy-two (72) hours of arrival in the Philadelphia prison system. Housing areas shall not include any gymnasium, corridor or bench area, or any area not set up for permanent housing. Every inmate shall receive a mattress the first night after arrival and a bed and mattress within twenty-four (24) hours of arrival. Until his or her assignment to a housing area, each inmate shall remain in designated intake areas and receive proper bedding. (Settlement Agreement, ¶ 3(c), p. 5)

The settlement agreement requires the City defendants to complete construction of the Philadelphia Industrial Correction Center, with at least 650 cells, by December 15, 1986[3] and a downtown detention facility, with at least 440 beds, by December 31, 1990. It phases in the limitations on the total population of the Philadelphia prison system. As of March 9, 1987, the population may not exceed 4,100 inmates; as of May 11, 1987, it may not exceed 3,950 inmates; as of July 13, 1987, it may not exceed 3,750 inmates. The maximum allowable population must remain no more than 3,750 inmates until the downtown detention facility opens in 1990. The settlement agreement also includes a maximum population limit for each individual facility, as well as a total limit for the entire system on given dates. The maximum allowable population for each facility on and after July 13, 1987 shall be:

| | |
|---|---|
| Detention Center | 750 inmates |
| Holmesburg Prison | 800 inmates |
| House of Correction | 900 inmates |
| Women's Modular Units | 200 inmates |
| Laurel Hall, Cannery and YMCA | 250 inmates |
| PICC | 850 inmates |

The implementation of these maximum allowable populations is left in the first instance to the City defendants and the Pennsylvania courts. (Settlement Agreement, ¶ 3f, p. 6). The agreement provides that no federal or state prisoners, other than inmates detained for immediate court appearances, shall be housed within the Philadelphia prison system, except for those federal prisoners in the custody of the United States Marshal. Prisoners in the custody of the United States Marshal may be housed by contract between the City of Philadelphia and the United States Marshal.

The City defendants are to provide counsel for plaintiffs on a weekly basis with daily population figures for each of the facilities within the Philadelphia prison system. Because the prison population fluctuates on a daily basis, the agreement provides that the maximum allowable population may be exceeded temporarily, but not for more than seven (7) consecutive days or for more than twenty (20) out of any forty (40) days. If the population of any facility exceeds its maximum allowable population, the agreement provides that the City defendants will seek the release, through the mechanism of the Bail Master appointed by the *Jackson* court or otherwise, of persons being held either on the lowest bail or persons sentenced to the Philadelphia prisons with less than sixty (60) days remaining on their sentences. Such releases shall continue until the maximum allowable population is achieved or restored. However, City defendants agree not to seek release of any person charged with, or convicted of, murder or forcible rape, or any inmate whose release would constitute imminent threat to public safety or to the inmate's

---

**3.** The Philadelphia Industrial Correction Center has been completed and is now operational.

own health, safety, or welfare. (Settlement Agreement, ¶ 5, p. 8).

If the population of any facility still exceeds its maximum allowable population twenty-one (21) days from the date on which the maximum allowable population has been exceeded for more than seven (7) consecutive days or for more than twenty (20) out of forty (40) days, a bar on admission of prisoners to such facility or facilities will go into effect. The bar on additional inmates will continue until the number of inmates housed is within the maximum allowable population and new admissions will not cause the maximum allowable population to be exceeded, except that persons charged with, or convicted of, murder, forcible rape, or a crime involving the use of a knife or firearm during the commission of an aggravated assault or robbery, may always be admitted notwithstanding this bar. (Settlement Agreement, ¶ 6, pp. 8–9).

The City of Philadelphia agrees to pay Twenty Thousand Dollars ($20,000) in damages to the named plaintiffs, to be distributed as determined by counsel for plaintiffs with the approval of the court. (The consent orders entered to date have not yet implemented the provisions concerning damages or fees.) The City defendants also agree to pay plaintiffs' costs and attorneys' fees in the amount of Ninety Thousand Dollars ($90,000). Plaintiffs will bear their own costs in monitoring the implementation of the agreement. However, if additional proceedings are required to implement or enforce the terms of the consent order and plaintiffs obtain substantial relief from those proceedings, the City defendants will bear plaintiffs' costs and reasonable attorneys' fees. The City defendants and plaintiffs agree to propose an order in the *Jackson v. Hendrick* litigation that complements the settlement agreement approved by this court. This agreement is not an admission by the City defendants of any fault or liability or of the existence of any unconstitutional conditions in the Philadelphia prison system.

The court retains jurisdiction over the parties and cause of action for five (5) years. After five (5) years, unless the parties reach agreement on the issue of continued jurisdiction or plaintiffs demonstrate at a hearing that continued jurisdiction is necessary to maintain the maximum allowable populations, this court will discontinue jurisdiction. All claims against the City defendants are dismissed with prejudice; all claims against defendants Marks and Jeffes are dismissed without prejudice; the plaintiff class has also agreed to the dismissal of defendant Waldman without prejudice but he objects. Defendants Marks, Jeffes and Waldman are not parties to the settlement agreement.

■ Because this litigation received so much publicity in the months immediately preceding the settlement hearing, the court determined that due process did not require any additional notice to the class before the equitable relief was approved. While some form of post-settlement notice is mandatory under Fed.R.Civ.P. 23(e) before approval of a class action settlement, *see Walsh v. Great Atlantic and Pacific Tea Company, Inc.*, 726 F.2d 956, 962 (3d Cir.1983), the trial court has broad discretion to determine the timing and manner of notice, *see, e.g., Quigley v. Braniff Airways, Inc.*, 85 F.R.D. 74, 77 (N.D.Tex.1979); Fed.R.Civ.P. 23(e); C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure* § 1797 (2d ed. 1986). The court determined that in order to approve the order providing class-based relief, a non-traditional form of notice was appropriate. Because of the nature of the class and the actual class-based relief sought and obtained, the court considered it unfeasible and unnecessary to send personal notice to City prisoners from 1980 to date, impossible and unnecessary to identify or notify future prisoners and unlikely that notices posted in the Philadelphia prisons would reach class members not reached by the prison class representatives as well as the extensive media publicity. The court considers the notice given by the extensive publicity in the news media the best notice of the class-based relief in the circumstances. *See Johnson v. Robin-*

*son,* 296 F.Supp. 1165 (N.D.Ill.1967), *aff'd,* 394 U.S. 847, 89 S.Ct. 1622, 23 L.Ed.2d 30 (1969); *cf. Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 833–34 (3d Cir. 1973).

In determining what manner of notice to provide, district courts have traditionally considered *inter alia* the cost of giving notice, the difficulty of identifying class members, the timing of the notice and the likelihood of notice reaching potential class members. *See, e.g., Greenfield,* 483 F.2d 824 (timing and effectiveness); *Tate v. Werner,* 68 F.R.D. 513 (E.D.Pa.1975) (cost, size, identification, timing); *see also In re Beef Industry Antitrust Litigation,* 607 F.2d 167 (5th Cir.), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). Individual notice has not traditionally been accorded in prisoner civil rights actions. *See, e.g., Costello v. Wainwright,* 489 F.Supp. 1100, 1101 (M.D.Fla.1980); *Tate,* 68 F.R.D. at 520–21.

Because of the size of the class, as well as its nature, the cost of identifying its members and giving them individual notice would have been prohibitive.[4] Unlike many other prisoner class actions, a relatively small percentage of the instant class is currently incarcerated in the Philadelphia prison system. Some members are incarcerated in state and federal facilities around the country; others are no longer incarcerated but may not have returned to their former addresses. The class also includes persons not yet incarcerated but who will be incarcerated in the prisons while the court retains jurisdiction; such persons are impossible to identify with accuracy at present. The settlement terms were sufficiently described in newspaper articles and radio reports to allow any member of the class to state objections either to the court or to plaintiffs' counsel.[5] Even if greater notice had been provided, persons currently incarcerated would not have been able to attend the hearing. Only written objections or objections conveyed through plaintiffs' counsel, *see, e.g., Costello,* 489 F.Supp. at 1101, would have been considered.

Because of the nature of the order entered, due process did not demand greater notice. If a consent decree embodies a plan and terms for effectuating it, notice may not be required as a prerequisite to the entry of the decree. *See Cunningham v. English,* 269 F.2d 539, 541 (D.C.Cir.), *cert. denied,* 361 U.S. 897, 361 U.S. 905, 80 S.Ct. 195, 4 L.Ed.2d 152, 4 L.Ed.2d 181 (1959); 3B *Moore's Federal Practice* ¶ 23.-80[3]. Notice was not required of the dismissal without prejudice of defendants Marks and Jeffes because there was no possible prejudice to the rights of any class member against them.

The award of money damages to named class representatives was reserved and, pursuant to the court's Order of January 6, 1987, personal notice was provided to the named class representatives and a Notice to the Class, approved by the court, was published in the *Philadelphia Inquirer* and the *Philadelphia Daily News* on Saturday, January 10, 1987 and Monday, January 12, 1987. In addition, the notice to the class with settlement order attached was posted on every cell block bulletin board and in the law libraries of all Philadelphia prisons from January 12, 1987 until at least

---

**4.** The City Solicitor's Office estimated that it would take a minimum of 1,500 hours of work to identify the persons who had been incarcerated in Holmesburg Prison only and to determine the period of incarceration from 1981 through 1985. Because the records are not computerized and are used during working hours, identification of class members would have to be done on an over-time basis.

The time and effort required to identify all persons who have been incarcerated in all Philadelphia prisons for the relevant time period would be much greater. The cost of mailing notice to last known addresses would also be substantial because of the size of the class and might not reach large numbers because of changes of address and other difficulties with mail contact. Of course, it would be impossible to identify with accuracy and notify those class members who have not yet been incarcerated.

**5.** While not a major factor in the court's decision, it is instructive to note that a number of calls were received by the court from prisoners requesting additional information on the settlement. These calls were referred to counsel for the plaintiff-prisoner class.

January 26, 1987. (See Affidavit of Notice to the Class, January 26, 1987). The court finds the notice provided adequate.

## II. *Approval of Settlement*

Federal Rule of Civil Procedure Rule 23(e) requires court approval of a class action settlement:

> A class action shall not be dismissed or compromised without the approval of the Court, and notice of the proposed dismissal or compromise shall be given to all members of the class....

Fed.R.Civ.P. 23(e). Approval of a proposed class action settlement is discretionary with the court. *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir.1975); *Ace Heating & Plumbing Company v. Crane Company,* 453 F.2d 30, 34 (3d Cir.1971). Settlement is a course favored by law, *Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.,* 455 F.2d 770, 773 (2d Cir.1972); *cf. Bank of America National Trust and Savings Association v. Hotel Rittenhouse Associates,* 800 F.2d 339, 345 (3d Cir.1986), but a settlement will be approved only if it is "fair, adequate, and reasonable" to the members of the class, *Walsh,* 726 F.2d at 965. The settlement must be both substantively reasonable compared to the likely rewards of litigation, *Shlensky v. Dorsey,* 574 F.2d 131, 147 (3d Cir.1978), and the result of good faith, arms length negotiations, *Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).

Specified factors must be considered prior to decision upon the fair, reasonable, and adequate nature of a proposed class action settlement. *See Malchman v. Davis,* 706 F.2d 426, 433–34 (2d Cir.1983) (nine factors); *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983) (six factors); *Officers for Justice v. Civil Service Commission,* 688 F.2d 615, 625 (9th Cir.1982), *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983) (eight factors). In *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975), the Third Circuit Court of Appeals approved the relevancy of the following nine factors in determining the fairness of a settlement:

> ... (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation....

*Girsh,* 521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)).

In considering the proposed settlement, the court's role is a limited one. The court may either approve or disapprove the settlement; it may not rewrite it. *See Armstrong v. Board of School Directors,* 616 F.2d 305, 315 (7th Cir.1980); *In re Real Estate Title and Settlement Services Antitrust Litigation,* MDL Docket No. 633, Slip Op. at 29 (E.D.Pa. June 10, 1986) (VanArtsdalen, J.).

## A. *The Complexity, Expense and Likely Duration of the Litigation*

Litigation of the constitutionality of the conditions of confinement in the Philadelphia prison system would be very complex for all parties, extremely expensive, at least for the defendants, and most likely of great duration, a burden for all parties, and not in the interest of the administration of justice. To make a determination of constitutionality, the conditions in the prisons must be examined in their totality. *See, e.g., Union County Jail Inmates v. DiBuono,* 713 F.2d 984, 999 (3d Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984). Evidence not only of the size of the prison population, the capacity of the facilities, and the availabili-

ty of services but also the effects of overcrowding on the prisoners would have to be heard. Statistical evidence would be offered, the expert analysis of which would be complicated, time consuming and expensive. Bringing inmates from the Philadelphia prisons to this courthouse to testify would take time of public employees and tax the public fisc. Trial time has been estimated at a minimum of several months and perhaps as long as a year or more. A lengthy trial is always expensive.

## B. *Reaction of the Class*

In determining whether the settlement is fair, adequate and reasonable, the court must consider any objections filed by members of the plaintiff-prisoner class. *See Walsh v. Great Atlantic & Pacific Tea Co.,* 726 F.2d 956, 965 (3d Cir.1983); *Greenfield v. Villager Industries,* 483 F.2d 824, 833 (3d Cir.1973); *see also Georgevich v. Strauss,* 772 F.2d 1078, 1085 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1229, 89 L.Ed.2d 339 (1986).

On January 27, 1987, four objections to the settlement were received from individual members of the class in custody at Holmesburg Prison. All four objections make identical averments dealing not with the damages awarded but with certain physical conditions. The settlement agreement provisions alleviating overcrowding are responsive to three of the five complaints presented to the court; the other two complaints are covered by the *Jackson v. Hendrick* decree. Each objector recognizes that none of the complaints standing alone shows cruel and unusual punishment even if they do so taken as a whole. The court has considered these "objections" and deems them in support of the settlement approved by the court rather than in opposition.

At the December 11, 1986 hearing on approval of the settlement, the court heard the reaction of one of the named class representatives, Martin Harris, a/k/a Arthur Carmichael, whose appearance was procured by writ of *habeas corpus ad testificandum.* Although Mr. Harris is now incarcerated in a state correctional institution not in the Philadelphia prison system, the court considered his favorable reaction to the settlement persuasive. Mr. Harris spoke eloquently on the improvement that would flow from settlement approval. Mr. Harris considered himself blessed to have been represented by good attorneys and was anxious to have the case concluded. The court has no reason to believe that the reaction of Mr. Harris is not typical of most of the class members.

The favorable reaction of the class supports court approval of the settlement.

## C. *The Stage of the Proceedings and The Amount of Discovery Completed*

The settlement was presented to the court before any significant formal discovery had been taken in this action. However, massive discovery has taken place in the related *Jackson v. Hendrick* litigation. In addition, in order to make an informed judgment of the fairness, reasonableness and adequacy of the settlement, the court required the parties to provide additional information. The court toured the facilities of the Philadelphia prison system and requested statistics specifically compiled. In addition, reports on the status of the Philadelphia prisons, regularly prepared and made available to the public, were filed of record.

Notwithstanding current availability of information concerning the prison system, a great deal of supervised discovery would have been required to bring this matter to trial if this settlement had not been approved. First, the conditions in the prisons have changed since the discovery in the *Jackson* litigation. Second, the information compiled by the prisons would have been subject to challenge by plaintiffs—both by fact and expert witnesses.

## D. *The Risk of Establishing Liability*

Although this action was filed in April, 1982, settlement negotiations did not begin in earnest until this court's Order dismissing the case was reversed by the Court of Appeals and a petition for writ of certiorari

was denied by the Supreme Court. Developments in the law make a present finding of unconstitutionality less certain than it was in April, 1982. Plaintiffs at one time might have prevailed on a contention that sharing a cell with another inmate constituted cruel and unusual punishment *per se* in Pennsylvania. However, in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court held that housing two or more inmates in a cell inflicted neither unnecessary, wanton pain nor was grossly disproportionate to the severity of crimes warranting imprisonment under certain circumstances. *Id.* at 348, 101 S.Ct. at 2400. The Supreme Court reaffirmed court responsibility to scrutinize claims of cruel and unusual confinement and recognized that conditions in some prisons were "deplorable" and "sordid," *id.* at 352, 101 S.Ct. at 2402, but *Rhodes* placed a greater burden on plaintiff prisoners to prove unconstitutional conditions. Since *Rhodes*, conditions of confinement have been found constitutional even where serious overcrowding existed. *See Smith*, 690 F.2d at 126.

Federal courts must now apply a "totality of circumstances" or "totality of the conditions of confinement" test when evaluating the conditions of confinement. *See, e.g., Union County*, 713 F.2d at 999; *Smith v. Fairman*, 690 F.2d 122, 125 (7th Cir.1982), *cert. denied*, 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983); *Madyun v. Thompson*, 657 F.2d 868, 874 (7th Cir.1981); *Inmates of Allegheny County Jail v. Wecht*, 565 F.Supp. 1278, 1295 (W.D. Pa.1983). Court consideration of the totality of the conditions of confinement makes it more difficult for the plaintiff-prisoner class to prevail. It virtually eliminates the likelihood that conditions of confinement will be declared unconstitutional on a motion for summary judgment. If defendants adduce sufficient evidence that the prison conditions are constitutional, the alleged unconstitutional conditions have to be established by proof in a lengthy and burdensome trial.

Recent developments in the *Jackson* litigation also make a finding of liability less certain. Plaintiffs in this action might have argued that the City defendants were collaterally estopped by the Court of Common Pleas' judgment in *Jackson* from defending the constitutionality of the conditions of confinement at least at Holmesburg. *See Harris*, 755 F.2d at 342 (citing Restatement (Second) of Judgments § 27 (1982)). However, on January 16, 1986, the Pennsylvania Supreme Court, in light of *Rhodes* and the repeal of all Pennsylvania statutes requiring single-celling, vacated the finding of unconstitutionality and held that a consideration of the "totality of the circumstances was required to determine whether conditions of confinement in the Philadelphia prisons are unconstitutional." *Jackson*, 509 Pa. at 470, 503 A.2d at 407–08.

The plaintiffs have experienced overcrowding and other conditions of the Philadelphia prisons but the court cannot be certain that a full trial would result in a final determination that the present Philadelphia prison conditions "deprive inmates of the minimal civilized measure of life's necessities." *Union County*, 713 F.2d at 997 (citing *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399). Settlement permits the plaintiff-prisoner class to live in less crowded facilities and receive greater access to finite existing services at once regardless of the eventual outcome of extended litigation.

The City defendants also had good reason to avoid the uncertainties of litigation. The court believed that the conditions of confinement in the Philadelphia prisons were such that it was possible that a finding of unconstitutionality would be made. If plaintiffs had succeeded in establishing unconstitutional conditions, the court would have had substantial discretion regarding injunctive relief. For example, the court could have ordered prison population limits more or less stringent than the settlement agreement provides so that prisoners would still be released or a bar on admissions would be imposed. Perhaps it would have required that additional facilities be built or that existing facilities be closed.

In addition, the City defendants, upon a finding of unconstitutional conditions, might have been liable to members of the plaintiff class for damages. Finally, if the class were to prevail, attorneys' fees awarded in accordance with 42 U.S.C. § 1988 (West Supp.1986) would most likely have been much greater than the $90,000 provided for by the settlement agreement. The court remains convinced that it was in the interest of the parties to encourage discussion of a fair and reasonable settlement between the plaintiff-prisoner class and the City defendants.

### E. The Risk of Establishing Damage or Harm

If the plaintiff-prisoner class established that the conditions of confinement in the Philadelphia prisons were unconstitutional, the court would order relief. A finding of unconstitutionality must be remedied.

### F. The Risk of Maintaining the Class Action Through Trial

Because there will always be persons incarcerated in the Philadelphia prison system, the risk that a class action would not be maintainable throughout the trial are almost non-existent. However, because the prison population changes constantly, there would be a need for frequent substitution of class representatives to have at least one inmate representative of each facility in the Philadelphia prison system. Plaintiff's counsel could be faced with changing views of the representatives substituted. This could increase the difficulty of representing the class competently and effectively.

### G. The Ability of the Defendants to Withstand a Greater Judgment

This factor is not relevant to the approval of a civil rights class action settlement in which a municipality is defendant. The municipality would be required to comply with whatever equitable relief the court ordered and pay whatever damages the court awarded. However, it is in the public interest that the City and the other City defendants, rather than the court, initially determine the changes made in the prison system to ensure compliance with the Constitution.

### H. Range of Reasonableness of the Settlement Fund

The court must review a settlement to determine whether it falls within a "range of reasonableness," not whether it is the most favorable possible result of litigation. *See Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). The court finds that the equitable and legal relief agreed to by the parties, as well as the attorney fees accorded to counsel for the plaintiff-prisoner class, are reasonable.

#### 1. Damages

The settlement agreement provides that the City of Philadelphia shall pay to named plaintiffs the sum of $20,000 as damages to be distributed as determined by counsel for plaintiffs with the approval of the court.

A nominal award of damages to the named plaintiffs where no award is made to the class members does not preclude a finding that the settlement is fair, reasonable and adequate. However, such an award does require the court to

> examine the settlement closely to ensure that the named plaintiffs have fairly represented the interest of the class. Where there are sufficient indications that the class has been treated fairly and that the relief for the named plaintiffs is not excessive, the provision of greater monetary relief does not warrant disapproval of the settlement.

*Luevano v. Campbell,* 93 F.R.D. 68, 89 (D.D.C.1981). An award of such damages may require the court to view the settlement agreement with skepticism, *see*

*EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir.1985); *Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983); *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir.1982), and may raise an inference or impose a presumption of unfairness of the settlement agreement. *Holmes*, 706 F.2d 1144; *Johnson v. Montgomery County Sheriff's Department*, 604 F.Supp. 1346 (M.D.Ala.1985); *Women's Committee for Equal Opportunity v. National Broadcasting Co.*, 76 F.R.D. 173 (S.D.N.Y.1977).

However, district courts have approved damage awards only to named plaintiffs when the named plaintiffs' contribution to the progress of the litigation has been especially meritorious and has justified such an award. *See Bryan v. Pittsburg Glass Co.*, 59 F.R.D. 616, 617 (W.D.Pa.1973), *aff'd*, 494 F.2d 799, *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974); *see also Jackson Lockdown/MCO Cases*, 107 F.R.D. 703 (E.D.Mich.1986); *Women's Committee*, 76 F.R.D. at 182 (S.D.N.Y. 1977). Where the award to named plaintiffs is excessive, or improper collusion or antagonism between the named plaintiffs and the plaintiff class exists, greater relief to named plaintiffs could cause a district court to disapprove a settlement. *See Plummer v. Chemical Bank*, 91 F.R.D. 434 (S.D.N.Y.1981), *aff'd*, 668 F.2d 654 (2d Cir.1982) (settlement disapproved where substantial disparity between benefits to class and named plaintiffs, members objected, and plaintiffs' counsel purposefully avoided compliance with Rule 23(e) in precertification settlement negotiations).

The court finds that, because of the nominal sum awarded in damages and the especially meritorious conduct of at least the named plaintiff Martin Harris, the award of damages is justified and does not preclude a finding that the settlement is fair, reasonable and adequate. However, additional notice to all plaintiffs has been ordered before allocation of the damages award is approved.

The court also finds that the award of damages is in the range of reasonableness in light of the best possible recovery and the attendant risks of litigation. Damage awards in prisoner civil rights cases are traditionally low. More importantly, although a prayer for damages is included in plaintiffs' second amended complaint, the primary relief sought is (and throughout the course of the litigation has been) injunctive relief aimed at reducing overcrowding and improving the conditions in the Philadelphia prisons. The nominal damage award is reasonable and does not create antagonism between the named plaintiffs and the rest of the plaintiff-prisoner class.

### 2. *Injunctive Relief*

The population limits and accompanying enforcement mechanism provided for in the settlement agreement are in the range of reasonableness in light of the best possible recovery and the attendant risks of litigation.

The remedies agreed to by the plaintiffs and City defendants will result in a reduction of the inmate population from 4,300 inmates, including 250 housed in the partially completed PICC, to 3,750, including 850 housed in the fully operational PICC. The court believes that the conditions of confinement in the prison system will be improved by this reduction in the population. While the court might order lower caps or relief in a wholly different form if unconstitutional conditions were established, the reduction provided for is reasonable under *Rhodes v. Chapman.*

If this action were litigated, the court would have to determine whether to permit plaintiffs to litigate the constitutionality of conditions in the entire Philadelphia prison system or only those in Holmesburg Prison. Claims asserting that the conditions in the entire system are unconstitutional were first alleged in the proposed second amended complaint. The court has thus far permitted an expanded class definition for settlement purposes only. If leave to amend

were denied, plaintiffs at Holmesburg would risk that conditions would be improved only at Holmesburg. If the population of Holmesburg were limited by transfer of some class members to other prisons, the class members no longer at Holmesburg would gain nothing and could suffer from greater overcrowding elsewhere. Plaintiffs not at Holmesburg would not be members of the class; not only would they fail to benefit from the litigation but their conditions might be worse as a result of its successful outcome.

The immediacy of the relief provided by the settlement agreement supports its adequacy. Rather than obtaining relief after lengthy discovery, trial on the merits and possible appeal, plaintiffs will receive the relief provided by the settlement in stages beginning almost immediately. In view of the varying length of the periods of incarceration of members of the class, some class members who would receive no benefit from litigation even if the class were to prevail, will benefit from settlement now.

### 3. *Attorneys' Fees*

The settlement agreement also provides for payment of $90,000 in attorneys' fees by the City of Philadelphia to Pepper, Hamilton & Scheetz, counsel for the plaintiff-prisoner class.

Under the "American Rule," each party to a lawsuit ordinarily bears its own attorneys' fees unless there is a statutory authorization to the contrary. *See Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983); *Alyeska Pipeline and Service Co. v. Wilderness Society*, 421 U.S. 240, 257, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *Perichak v. International Union of Electronic Radio*, 715 F.2d 78, 79 (3d Cir.1983). Statutory authorization for payment of attorneys' fees to the prevailing party in a civil rights action is provided by the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C.A. § 1988 (West 1981). A prevailing plaintiff in a civil rights action "should ordinarily re-

cover an attorney's fee unless special circumstances would render such an award unjust." *Hensley*, 461 U.S. at 429, 103 S.Ct. at 1937 (quoting S.Rep. No. 94–1011 at 4 (1976)).

An award of attorneys' fees may be made under section 1988 after a consent order has been entered in a civil rights action. *See Maher v. Gagne*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Newman v. Graddick*, 740 F.2d 1513, 1519 (11th Cir.1984); *see also King v. Greenblatt*, 560 F.2d 1024 (1st Cir.1977). Plaintiffs who have vindicated rights through the entry of a consent decree rather than through litigation are nonetheless considered "prevailing parties" for purposes of the award of attorneys' fees. *See Maher*, 448 U.S. at 129, 100 S.Ct. at 2575; *Newman*, 740 F.2d at 1519. "Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issue or on a judicial determination that the plaintiff's rights have been violated." *Maher*, 448 U.S. at 129, 100 S.Ct. at 2575.

In obtaining the entry of the consent order, the plaintiff-prisoner class received substantial relief from the allegedly unconstitutional conditions of confinement in the Philadelphia prison system. In order to obtain the consent decree, plaintiff's counsel not only negotiated the settlement with the City but earlier obtained a reversal of the trial court's order dismissing the suit by the Court of Appeals and the denial of a petition for writ of certiorari by the Supreme Court. Plaintiff's counsel was conscientious and effective both in legal argument and in negotiation. The consent order attained makes clear that the plaintiff-prisoner class is a "prevailing party" in this litigation for the purposes of section 1988 and would have been eligible for an award of attorneys' fees. However, the parties chose to settle the issue of fees, as the Supreme Court has stated they "ideally" should. *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941.

Package settlements of both the merits and attorney fees in civil rights actions were recognized by the Supreme Court in *Marek v. Chesny,* 473 U.S. 1, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985). In *Evans v. Jeff D.,* —— U.S. ——, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), the Court held that a district court did not abuse its discretion by approving a settlement of the merits with waiver of attorneys' fees in a civil rights class action. 106 S.Ct. at 1538, 89 L.Ed.2d at 759.

After determining that the plaintiffs are "prevailing parties," the district court, in approving an agreed-upon award of attorneys' fees, must determine whether the fee requested is "reasonable." *See Hensley,* 461 U.S. 424, 103 S.Ct. at 1935. In determining reasonability, the court looks to a number of factors. First, it examines the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. The court's inquiry in approving a settlement of the fee issue need not be as thorough as if there were a contested award of attorneys' fees but the same factors are generally relevant.

The court has examined the billing records of Pepper, Hamilton & Scheetz in connection with this litigation. The standard value ("lodestar") of the time billed by the attorneys, law students, paralegals, and library students from the time the firm was appointed to represent the plaintiff-prisoner class, through December 13, 1986 was $140,165.75 (of which only $538.75 was non-lawyer time). The $90,000 fee payment covers not only time already worked but also time that will be worked by counsel for the plaintiff-prisoner class in monitoring the consent decree. In addition, disbursements of $7,859.72 were accounted for by the firm. Although expenses for word processing, duplicating, messenger service, postage, telephone, secretarial overtime, meals and travel might not have been allowed if contested, it is clear that there was at least $1,767.16 in reimbursable costs.

The hours attributed to this litigation and the hourly rates chargeable were reasonable in light of the experience and ability of the lawyers involved, the excellent result achieved and the difficulty of the litigation; those hours were reasonably spent and adequately documented. The agreement on $90,000 in attorneys' fees as a term of the settlement is reasonable and another factor in favor of approval of the settlement.

The court also examined the process by which the settlement was reached and found it to be the result of good faith, arms' length bargaining. Although the court must independently evaluate the proposed settlement, the professional judgment of counsel involved in the litigation is entitled to significant weight. *See, e.g., Jamison v. Butcher & Sherrerd,* 68 F.R.D. 479 (E.D.Pa.1975). The decision to settle on the terms negotiated was made by highly experienced counsel, knowledgeable of the Philadelphia prison system and class action litigation. David Richman, Esquire, lead counsel for the plaintiff-prisoner class, participated in two landmark investigations of the conditions of confinement at Holmesburg during his former employment with the Office of the District Attorney of Philadelphia County. Mr. Richman has also served as an officer of the Pennsylvania Commission for Effective Criminal Justice. Mr. Richman, along with associate counsel, was personally involved with all aspects of the settlement negotiations and the decision to accept the settlement agreement was made after a thorough evaluation of all relevant factors, including the competence, experience, and tenacity of opposing counsel.

The settlement agreement that the court approved was not reached until almost a year after the denial of the petition for writ of certiorari by the Supreme Court. During this period the parties participated in extensive settlement negotiations. The City defendants also consulted with other officials of state and local government in

their effort to reach an agreement acceptable not only to the parties but also to those peripherally affected by the agreement. Although the court did not participate in the settlement negotiations, it received reports of their progress. From those reports, from the settlement itself and from its experience in dealing with counsel during the course of this litigation, the court is convinced that the settlement was the result of arms' length bargaining and is in the best interest of the class.

Lawyers for the City defendants and the inmates argue that the reduction in prison population can be achieved without harm to the public. The court has not ignored the fact that the District Attorney contends the settlement agreement would require the release of dangerous prisoners. But the District Attorney ignores that the agreement precludes release of those who have been charged with murder or forcible rape nor any person whose release would constitute an imminent threat to public safety or to the inmate's own health, safety or welfare. By his repeated contention that the court's approval of the settlement will release "dangerous criminals," he ignores a record that established that 70% of Philadelphia prison inmates have not been convicted but are awaiting trial; they are in jail for failure to post as little as $100 or $500 as bail to secure their appearances for trial. The solution to prison overcrowding that arguably rises to the level of violation of the constitutional prohibition against cruel and unusual punishment is not to ignore or condone it but to improve the criminal justice system to provide the prompt preliminary hearings and speedy trials mandated by our Constitution.

It is public knowledge that there are presently ten judicial vacancies (four new positions not yet filled and six vacant due to deaths and retirements) and 15 judges temporarily suspended from sitting on the bench as a result of a federal criminal probe. But the Governor has appointed a Philadelphia Trial Court Nominating Commission to make prompt recommendations for the ten vacancies and the status of the suspended judges should be clarified long before the expiration of this court's jurisdiction under the terms of the settlement agreement.

Chief Justice Nix has recently announced various measures in this "time of crises" stating, "it provides an opportunity to institute reforms and practices which will enure to the long-term enhancement of the operation of the system," the Chief Justice has required that, "In the disposition of the criminal list, priority is to be given to cases where the untried is being held in detention awaiting trial." *The Retainer*, January 28, 1987, p. 6.

Those entrusted with responsibility for the administration of the Philadelphia prison system and the City administration believe the terms of the settlement agreement are realistic and enforceable. Successful implementation will require renewed effort by the City defendants, District Attorney, defense bar, court administrators and most of all by the hardworking judges of the state trial courts. But with their cooperation, it is clear that compliance can be achieved. Respect for the Constitution can only be in the public interest; for these reasons, the settlement agreement was approved and the consent order entered.